UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
MILADY MARTINEZ,                                       :
                                                       :
                        Plaintiff,                     :
                                                       :        **OPINION & ORDER**
            -against-                                  :        06 CV 1931 (DLI) (MDG)
                                                       :
JO ANN B. BARNHART[1],                                 :
COMMISSIONER, SOCIAL SECURITY                          :
ADMINISTRATION,                                        :
                                                       :
                        Defendant.                     :
-----------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

    Plaintiff Milady Martinez ("Martinez" or "Plaintiff") filed an application for disability
insurance benefits and Supplemental Security Income ("SSI") payments under the Social
Security Act on September 1, 2000, claiming she was unable to work due to systemic lupus
erythematosus ("SLE").    On March 3, 2006, the Commissioner of the Social Security
Administration's ("Commissioner") final decision denying her claim was issued.    Pursuant to
Fed. R. Civ. P. 12(c), the Commissioner now moves for judgment on the pleadings, affirming
her determination that Plaintiff is not disabled.    Plaintiff cross-moves for judgment on the
pleadings, seeking reversal of the Commissioner's decision or, in the alternative, remand for
further development of the record.    For the reasons stated below, Plaintiff's motion is denied and
Defendant's motion is granted.

**I.  Summary of Facts**

*Plaintiff's Benefits Application*

_____

    [1]    Pursuant to Fed. R. Civ. P. 25(d), Michael J. Astrue shall be substituted for
Commissioner Jo Anne B. Barnhart as the defendant in this action.

On September 1, 2000, Plaintiff filed her application for Supplemental Security Income. (Admin. R. 41-42; 64).[2] She was nineteen at the time and claimed she had been unable to work since January 1, 2000 because of SLE. Plaintiff's application for benefits stated that the SLE caused constant fatigue and caused her body to ache "all the time." (Admin. R. 64). The Social Security Administration denied her claim initially and on reconsideration. (Admin. R. 30-32; 34-37). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). Her hearing was held on January 14, 2002. Accompanied by counsel, Plaintiff testified on her own behalf. On May 30, 2002, the ALJ found that Plaintiff was not disabled. (Admin. R. 798-808). On May 2, 2003, the Appeals Council vacated the ALJ's decision and remanded the case with instructions to the ALJ to give further consideration to the treating and examining source opinions pursuant to the provisions of 20 C.F.R. 416.927 and Social Security Rulings 96-2p and 96-5p. (Admin. R. 22). The Appeals Council also requested that the ALJ "explain the weight given to such opinion evidence and further evaluate the claimant's mental impairment in accordance with the special technique described in 20 C.F.R. 416.920a." *Id.*

Plaintiff's hearing on remand began on December 3, 2003. Again, Plaintiff was represented by counsel. During this hearing, the ALJ heard testimony from Dr. Harold Bernanke, an internist and medical expert, and Miriam Greene, a vocational expert. The ALJ issued its ruling on April 8, 2004, and found that Plaintiff was not disabled. The decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's second request for review on March 3, 2006. (Admin. R. 3-6). This lawsuit was timely filed.

*Testimonial Evidence*

---

[2]References to "Admin. R." are to the Administrative Record filed with this court on August 21, 2006.

Plaintiff testified that she was diagnosed with her illness in 1994, but was able to graduate from high school even though she often missed school and slept through class. (Admin. R. 738-40). From November 1999 through January 2000, during her senior year of high school, Plaintiff worked part-time as a cashier in an auto parts store for approximately four hours a day. *Id*. She left the job "because of constant fatigue," joint pain, and swelling of the joints. *Id*. at 754. Plaintiff's efforts to obtain employment after graduation were complicated by her inability to "stay up and feel calm and relaxed" and she did not get another job. *Id*. at 755. Since January 2000, Plaintiff's sister has supported her financially. Plaintiff lives with her boyfriend's sister in a third-floor apartment. (Admin. R. 761). Plaintiff spends her days reading, cooking, watching television, cleaning her room, and spending time with her boyfriend. (Admin. R. 735-36). Plaintiff does not have a license to drive, and her sister drives her when she needs to go somewhere. Plaintiff rarely uses public transportation. (Admin. R. 756). Approximately once a month, Plaintiff watches her sister's four-year-old godson. (Admin. R. 762-63).

At the hearing, Plaintiff testified that her symptoms include fatigue, joint pain, and swollen knees and hands. "My hands, I can't crunch them up into a fist . . . because they're swollen." (Admin. R. 763). Plaintiff stated that she "walk[s] fine," but has trouble breathing if she walks too fast. (Admin. R. 764). Plaintiff has no problems sitting, but she sleeps sitting up because of the pain she experiences when she lies down. Plaintiff testified that she does not have problems lifting, but she "can't do movements" when lifting "because it hurts my chest when I breath in." (Admin. R. 765). Plaintiff did not specify a weight that she can lift comfortably.

Plaintiff experiences discomfort on a daily basis, and she claims to experience "flares" five to seven times a year. (Admin. R. 769). These flares signal an onset of increased pain, and

she increases her normally "low maintenance doses" of Prednisone as a remedy. (Admin. R. 772). In general, Plaintiff takes Prednisone, Plaquenil, and Motrin to relieve her pain. However, Plaintiff testified at her first hearing that Motrin is an ineffective remedy.

Plaintiff also testified that she felt "stressed" because of the SLE, but she was never clinically depressed and she did not see a psychiatrist or psychologist. (Admin. R. 770). In her Reconsideration of Disability Report, Plaintiff also claimed to be "emotionally stressed out" and that she "cries over anything." (Admin. R. 77). She also stated that although she once considered applying to college, and would still like to attend, she felt she was unable to stay focused on academics long enough to attend. (Admin. R. 777). Plaintiff never completed her college admission application. *Id.*

Plaintiff has received treatment for SLE and related symptoms at Bellevue Hospital since 1994. Dr. Herbert Lazarus was Plaintiff's primary rheumatologist at Bellevue's pediatric cardiology clinic since that time. Plaintiff came under the care of Dr. Jill Landis at the adult rheumatology clinic around the time she turned twenty in January 2000. (Admin. R. 187; 759-60).

*Medical Evidence*

**A. Physical Complaints**

**1. Hospital visits**

The medical records that the ALJ reviewed contain clinical notes from Bellevue Hospital tracing the course of Plaintiff's treatment for SLE since an initial visit in 1997. (Admin. R. 216). In February 2001, Dr. Lazarus noted that Plaintiff was previously diagnosed with SLE in 1994. (Admin. R. 148). There is no indication in the record as to who made the initial diagnosis. Dr. Lazarus simply noted that Plaintiff had already been diagnosed with SLE.

In 1998, around the time that Plaintiff was finishing high school, Plaintiff's SLE was medically stable. (Admin. R. 211; 212). In March 1998, Plaintiff visited the emergency room of Bellevue Hospital after experiencing painful urination for three days.[3] (Admin. R. 217). Plaintiff was diagnosed as having a urinary tract infection. (Admin. R. 219). She was prescribed antibiotics and discharged. There is nothing in the clinical notes to indicate that this emergency room visit was related to Plaintiff's SLE. In May 1998, her physician noted that Plaintiff was "clinically doing well." (Admin. R. 211). The alopecia Plaintiff had been experiencing had subsided.[4] *Id.* On October 7, 1998, a physician described Plaintiff as stable and doing well, despite Plaintiff's complaint that her chest hurt when she took deep breaths. (Admin. R. 212). The physician diagnosed her as having costochondritis, and prescribed her ibuprofen to treat it. *Id.* He also referred her to an orthopaedist.

In January 1999, Plaintiff suffered from a rash and joint inflammation. (Admin. R. 206). She treated her symptoms with hydrocortisone cream to reduce the inflammation and irritation. *Id.* On January 20, 1999, Plaintiff's SLE was "in [a] stable phase." *Id.* On May 19, 1999, Plaintiff complained of pain in the small joints of her hands. (Admin. R. 202). Dr. Victor Martin noted that Plaintiff had fair exercise tolerance despite this pain. *Id.* He also noted that Plaintiff refused to wear sunscreen, despite her photosensitivity. *Id.* In June 1999, Plaintiff complained of pain in her fingers and wrists and of general fatigue while in school. (Admin. R. 201). She suffered from a malar rash. Notes from the June visit indicate that Plaintiff still refused to wear

---

[3] Non-emergency doctor visits took place at the Bellevue Hospital Pediatric Rheumatology Clinic until roughly September 2001. (Admin. R. 288). Except were noted, the name of examining physicians at the rheumatology clinic and at other facilities is illegible.

[4] Earlier mention of Plaintiff's alopecia is absent from the record.

protective sunscreen because she found sunscreen to be "too oily." *Id.* There was no indication she suffered from alopecia at the time.

On October 27, 1999, Plaintiff had an echocardiogram. (Admin. R. 193). She was eight weeks pregnant at the time. The results were normal. The echocardiogram revealed only mild mitral regurgitation with a normal-appearing mitral valve, and Plaintiff had mild to upper mild tricuspid regurgitation. *Id.* Her aortic valve and coronary artery were normal. *Id.* In addition, Plaintiff was not experiencing any fever, rash, or weight loss at the time. (Admin. R. 200).

In December 1999, Plaintiff reported that she was feeling fine since her last visit to Bellevue's rheumatology clinic despite "slight swelling" of the joints in her hands and a rash across her eyelids. (Admin. R. 263). She was found to be clinically stable on a combination of Prednisone and Plaquenil and no change of her medication was recommended. *Id.*

In January 2000, Plaintiff complained of only a general pain in her wrists, fingers, and shoulder. (Admin. R. 191). There were no signs of alopecia or chest pain. *Id.* A February 2000 clinical note indicated that Plaintiff had "mild arthritis/arthralgia," increased rash, chest pain, and shortness of breath, but she had no fever, weight loss, or alopecia. (Admin. R. 258). In March 2000, doctors noted that, while she had pain in her fingers again, she maintained a full range of motion. (Admin. R. 255). At the time, there was no "evidence of major organ flare - only arthralgias." *Id.* Also in March, Plaintiff elected to terminate her pregnancy. (Admin. R. 253).

The medical records from Plaintiff's May 5, 2000 visit to the rheumatology clinic show that Plaintiff had experienced some weight loss and fatigue since her abortion. She was diagnosed as having membranous glomerulonephritis. *Id.* The medical records note that her symptoms could have been due to Plaintiff not taking her medicine. *Id.* Plaintiff was instructed to increase her dosage of Prednisone. *Id.*

A follow-up examination conducted on July 19, 2000, revealed clear lungs, a nontender abdomen, and no swelling or joint tenderness in Plaintiff's extremities. (Admin. R. 250). Plaintiff's Prednisone dosage was decreased. *Id.* The July 19, 2000 medical records also note that Plaintiff continued to suffer from membraneous nephritis and occasional joint pain. (Admin. R. 250). However, she was found to be clinically stable and she no longer complained of fever or photosensitivity. *Id.* Her lungs were clear and she had no joint swelling or tenderness. Plaintiff had good range of motion in her joints. *Id.*

Medical records for a physical exam of Plaintiff conducted on September 27, 2000, indicate that Plaintiff had experienced an SLE flare that manifested in a malar rash, increased joint stiffness, and alopecia that worsened with exposure to sunlight. (Admin. R. 190). However, Plaintiff maintained good motion in her joints despite swollen fingers and mild tenderness. *Id.* Plaintiff was restarted on Plaquenil, and her dosage of Prednisone was raised to 20 mg. *Id.*

In May 2001, Plaintiff experienced another flare that lasted for three weeks. The medical records described the flare as involving "mild[ly] increased activity." (Admin. R. 291-93). Plaintiff complained of nausea and pains in her chest when she took deep breaths. During her examination, Plaintiff told the doctor that she was seeking SSI benefits so that she could attend college. She added that she was stressed out and that she wanted to stop taking her medication. Her physician responded by prescribing Vioxx to Plaintiff. It is unclear from the record how long Plaintiff took Vioxx.

In August 2001, an attending physician in Bellevue's emergency care unit found that Plaintiff displayed a photosensitive rash, but no fever. (Admin. R. 313). The rash was treated with hydrocortisone acetate. *Id.* Plaintiff was told to return if she experienced a fever, difficulty

breathing, or a worse rash. *Id.*

Plaintiff returned to the emergency care unit in September 2001 for a follow-up appointment.[5] During this visit, the attending physician described her as having SLE and "mildly active" discoid lupus erythematosus ("DLE") and that she was otherwise clinically stable. (Admin. R. 288). Plaintiff complained of headaches, continued fatigue, and arthralgia. *Id.* The doctor instructed her to avoid the sun, as well as to get both an eye exam and her X-Rays. *Id.*

Plaintiff received Pediatric Emergency Service at the Bellevue Hospital Center on October 26, 2001, for a rash and swelling of her left groin, as well as, fever and abdominal pain. (Admin. R. 284-87). *Id.* Plaintiff was diagnosed with cellulitis and she was prescribed Cephalexin. *Id*.

On January 5, 2002, Plaintiff returned to Bellevue Hospital complaining of a headache. She stated that she had experienced the headache three times a day for more than a month and that she could not sleep because of it. In addition, she complained of continued arthralgia with occasional swelling and prolonged stiffness of the joints in her fingers. She also complained of pain in her chest. During that visit, Plaintiff was diagnosed as having costochondritis and was prescribed Motrin to relieve the pain. Apparently, Plaintiff neglected to get X-Rays as she was instructed to do by her doctor. Plaintiff was then asked to get lab work done.

In March 2002, Plaintiff went to Bellevue complaining of pain in her chest and finger joints. She also presented "mild" lesions above her ear. (Admin. R. 317). The medical record notes that Plaintiff was noncompliant with the orders to obtain lab results and X-Rays and that

---

[5] The medical records indicate that Plaintiff had stopped visiting the rheumatology clinic by September 2001.

Plaintiff had a "history of poor compliance." *Id.*

In December 2002, Plaintiff underwent another echocardiogram. (Admin. R. 304). Once again, her results were described as "normal." *Id.* Doctors found only mild mitral and tricuspid insufficiency. *Id.*

During a January 14, 2003 visit to Bellevue Hospital's emergency room, Plaintiff again complained of chest pain, but she did not report a fever, cough, or edema. (Admin. R. 304). Later that month, Dr. Maj Wickstrom evaluated Plaintiff's lungs at the Bellevue Hospital Center Radiology Department. (Admin. R. 583). Her lungs were clear, and there was no evidence of pleural effusion. She had normal airways and normal heart size. Her upper abdomen was unremarkable, and she had no significant intrathoracis adenopathy. She tested negative for pneumonia. Plaintiff's chest pain persisted through her subsequent visit in March 2003. During that appointment, the medical records indicate that Plaintiff's rash had increased. In June 2003, Plaintiff obtained X-Rays and lab tests. (Admin. R. 302). The X-Rays and lab tests revealed that she was clinically stable, despite poor sleep and fatigue. *Id.* She had no rash, no oral ulcers, and no edema. *Id.*

In February 2004, Plaintiff experienced a new rash across her temporal area and right thigh. (Supplemental Admin. R. 12). A doctor prescribed hydrocortisone and Aquophor for her rash. *Id.* Plaintiff reported experiencing no pain at the time. (Supplemental Admin. R. 9).

In April 2004, doctors from Bellevue Hospital's Pediatric Emergency Service Unit diagnosed plaintiff with herpes zoster due to a rash that had spread across the trunk of her body and lower back. (Admin. R. 719). One doctor noted that her rash was draining and "oozing," and Plaintiff complained of wheezing. *Id.* However, her extremities were at full strength, and she experienced no fever, vomiting, numbness, or weakness. *Id.*

In September 2004, Plaintiff reported experiencing no pain to doctors at Bellevue Hospital's Pediatric Emergency Service Unit, but she revealed "small vesicular lesions" on her lower back and she complained of an increased itch. (Supplemental Admin. R. 13). A doctor prescribed Hydrochloroquine for Plaintiff to take in addition to Prednisone. *Id.* In November 2004, Plaintiff's wheezing and rash had subsided, but she reported experiencing abdominal pain that had lasted for two days. (Admin. R. 699). Her pain medication had not helped the pain subside. *Id.* She denied experiencing vomiting or diarrhea. *Id.* Doctors diagnosed Plaintiff with colitis and prescribed a steroid to treat it. *Id.*

### 2. Treating Source Reports

On October 5, 2000, Dr. Xiaoyin Tang, a rheumatology fellow at Bellevue Hospital, wrote a report and functional assessment based on a July 19, 2000, examination.[6] (Admin. R. 135-39). Dr. Tang diagnosed Plaintiff with SLE, membranous nephropathy, and anemia and he noted that she experienced fatigue, alopecia, a skin rash, and arthralgia. Dr. Tang further noted that Plaintiff took Prednisone, Plaquenil, Motrin, and various vitamin supplements like iron sulfate and calcium. He added that while Plaintiff responds well to increased doses of Prednisone, she still suffers from intermittent flares. He found that Plaintiff evinced no signs of a psychiatric disorder, and there were no sings of depression. (Admin. R. 137).

In Dr. Tang's opinion, Plaintiff could stand and/or walk up to two hours in an eight-hour day. (Admin. R. 137). He found she could sit without limitation. (Admin. R. 138). Dr. Tang

---

[6]In the Disability Report she filed on September 1, 2000, Plaintiff claimed that Dr. Tang first examined her in January 1994. (Admin. R. 66). She also claimed that Dr. Tang saw her most recently in August 2000 to perform blood tests and monitor her SLE. *Id.* Further, the instructions requested that Plaintiff "list each doctor/HMO/therapist" that she had seen and she names only Dr. Tang. (Admin. R. 66-69). As explained below, Dr. Tang's report conflicts with other medical evidence and there is no evidence that Dr. Tang saw Plaintiff more than this once.

also concluded that Plaintiff could lift and carry up to five pounds, but Plaintiff's strength was limited in her upper extremities due to fatigue and arthralgia. (Admin. R. 137; 138). He also found that Plaintiff would have to rest between one and two hours after "any physical activity." (Admin. R. 137).

In January 2001, Dr. Lazarus, who had treated and examined Plaintiff for approximately seven-years, noted that Plaintiff's SLE involved her kidneys and it was associated with hematologic, dermatologic, and articular disease. (Admin. R. 187). He described her condition as "tenuous" with ongoing inflammation undermining the functioning of her kidneys. *Id.*

On February 21, 2001, Dr. Lazarus, filled out the same report as Dr. Tang had only four months earlier. (Admin. R. 148-52). Like Dr. Tang, Dr. Lazarus found that Plaintiff suffered from SLE, membranous nephropathy, and anemia. (Admin. R. 148). Dr. Lazarus' report notes that he treated Plaintiff with a combination of Prednisone and Plaquenil and she experienced malaise and fatigue consistent with chronic disease, arthritis in her hand, chest, knees, ankles, and hip. (Admin. R. 149).

Unlike Dr. Tang, Dr. Lazarus found that Plaintiff could lift and carry objects for up to one-third of the day, and that she could stand and/or walk for up to six hours a day, despite her fatigue and malaise. (Admin. R. 151). Dr. Lazarus also found that Plaintiff could sit without limitation, and was limited in her ability to push and/or pull. *Id.* He added that once she is fatigued, Plaintiff would have to rest from several minutes to an hour. (Admin. R. 150). Dr. Lazarus concluded that Plaintiff suffered from chronic disease associated with SLE flares. (Admin. R. 152).

Dr. Lazarus provided another report dated January 9, 2002. (Admin. R. 278-82). In it, he noted that Plaintiff suffered from both SLE and discoid lupus erythematosus ("DLE"), and

that she presented a butterfly rash, discoid lesions, arthritis and serologic evidence of SLE. (Admin. R. 278). A renal biopsy also confirmed the presence of membranous glomerulonephritis. (Admin. R. 278, 282). Dr. Lazarus detailed Plaintiff's drug regimen at the time: Prednisone, Plaquenil, calcium carbonate, a multivitamin, and sunblock. According to Dr. Lazarus, Plaintiff's prognosis was dependent on the frequency and severity of her flares. Plaintiff suffered from frequent flares involving her renal system, but there was no involvement of her cardiac, pulmonary, gastrointestinal, or nervous systems. (Admin. R. 279-80). He further reported that Plaintiff had leukopenia and anemia. (Admin. R. 280).

In the January 9, 2002, report, Dr. Lazarus found that Plaintiff could sit continuously for two to three hours at a time during an eight hour workday. (Admin. R. 279). During that time, she could stand continuously for up to one hour for a total of three hours. *Id.* She could walk continuously for up to one hour for a total of three hours a day. *Id.* However, she could not lay down at all. *Id.* Regarding lifting and carrying, Dr. Lazarus found that Plaintiff could carry up to five pounds "frequently,"[7] and she could carry between six and twenty pounds "occasionally."[8] (Admin. R. 281). However, she could never carry or lift more than five pounds. Nor could she manipulate her hands and arms on a repetitive basis. *Id.* Lastly, Dr. Lazarus found that Plaintiff could "occasionally" bend, squat, crawl, climb, and reach during a workday. *Id.*

On February 11, 2003, Dr. Landis wrote a medical report on the status of Plaintiff's SLE, although the report is incomplete. Dr. Landis found that Plaintiff could lift and carry objects weighing between five and one hundred pounds "occasionally" throughout a workday. She also

---

[7]"Frequently" is defined as between 34% and 66% of an eight hour workday. (Admin. R. 281).

[8]"Occasionally" is defined as between 1% and 33% of an eight hour workday. (Admin. R. 281).

found that Plaintiff could "occasionally" bend, squat, crawl, climb, and reach. (Admin. R. 297). Three months later, on May 3, 2003, Dr. Landis wrote a letter describing Plaintiff's SLE as involving her kidneys, joints, lungs, and skin.[9] She added, "[Plaintiff] is currently unable to walk [more than] five blocks, stand [more than] one hour, a[nd] carry [more than] ten pounds." (Admin. R. 695). Dr. Landis' February 2003 report clearly contradicts her May 2003 findings and there is no attempt in the record to reconcile the two.

### 3. Consultative Exams

A board certified pediatric rheumatologist examined Plaintiff July 19, 2000, and completed a Medical Report for Determination of Disability on August 2, 2000. (Admin. R. 127-28). The rheumatologist reported that Plaintiff had SLE with nephritis and that it required oral steroids. However, the report also notes that Plaintiff did not have a marked restriction of daily activities. (Admin. R. 128). The doctor also found that while Plaintiff could not do usual work, she could work so long as she avoided the sun, avoided crowds, and was able to visit a medical doctor "on [a] monthly basis." *Id.*

On October 23, 2000, Dr. Michael Polak conducted a consultative examination. (Admin. R. 129-34). Plaintiff reported back, knee, and hand pain, but she denied lower extremity weakness and paresthesias. (Admin. R. 129). She claimed that she experienced difficulty with activities that required dexterity and had difficulty climbing stairs. Plaintiff complained of alopecia of the posterior scalp, but she denied rashes and shortness of breath. She also reported that she suffered from discoloration of her fingers when exposed to cold air. In his report, Dr. Polak noted that doctors had treated Plaintiff with Hydroxychloroquine and Prednisone.

---

[9]The letter did not specify a recipient; nor was it written on official stationery. (Admin. R. 695). It fails to specify what, if any, evidence served as the basis for the opinion.

Plaintiff told Dr. Polak that she lived on the third floor of an apartment building with no elevator. *Id.* She cooked and made beds without assistance. *Id.* Plaintiff also reported that she socialized with friends, and she arrived for the examination by bus. *Id.*

Dr. Polak noted that Plaintiff appeared to be in no acute distress and that she ambulated without difficulty. (Admin. R. 130). Her gait was within normal limits. She had no difficulty rising from her chair, getting on and off the examination table, or opening her gown for her examination. *Id.* Polak listed no impairments of Plaintiff's head, neck, or lungs. *Id.* Plaintiff's skin had no rashes and no jaundice. (Admin. R. 131). Her lymph nodes were not palpable. *Id.* More importantly, according to Dr. Polak's report, Plaintiff had no deformities in her knees and no obvious deformity in her hands and she was able to make a full fist with a grip rated at "4/5." (Admin. R. 130). However, her fingertips were discolored. *Id.* Plaintiff had full range of motion in her remaining joints and she was able to squat. *Id.* Subsequent radiographic examinations of Plaintiff's spine, right knee, and right hand supported Dr. Polak's findings. (Admin. R. 132-33). A subsequent blood test revealed that Plaintiff's hematocrit level was 33.1. Dr. Polak considered Plaintiff's hematrocrit level abnormal, but he stressed that it was not low enough to qualify as evidence of disability.

Dr. Polak concluded that, based on Plaintiff's medical history and the examination he conducted, Plaintiff was "mildly impaired for carrying/lifting, pushing/pulling, bending, sitting, walking, or standing" but she had "no difficulty doing activities requiring dexterity." (Admin. R. 131).

On November 10, 2000, Dr. Peter Seitzman, a State agency medical review consultant, reviewed the record and provided a functional assessment. (Admin. R. 140-47). He found that Plaintiff could occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry up

to ten pounds, stand and/or walk for approximately six hours in an eight-hour workday, and sit for approximately six hours. He noted no postural, manipulative, visual, communicative, or environmental limitations. (Admin. R. 142-44).

Dr. Babu Joseph conducted a consultative examination on March 28, 2001. (Admin. R. 160-64). He observed that Plaintiff's gait and station were normal. (Admin. R. 161). Plaintiff had rashes on her hand. Dr. Joseph noted that Plaintiff suffered from tenderness in her left hip and knee with reduced range of motion, but she had full range of motion in her other joints. Plaintiff's fine and gross finger dexterity were normal. An examination of Plaintiff's neck, spine, chest, heart, and abdomen showed no abnormalities. (Admin. R. 161-62). Plaintiff's neurological examination was unremarkable. Dr. Joseph found that Plaintiff was "mildly restricted" in walking, prolonged standing, carrying and lifting due to generalized joint pain associated with weakness and fatigue secondary to SLE. (Admin. R. 162). He concluded that Plaintiff could sit without limitation.

### 4. Psychological examinations

Dr. Renee Ravid conducted a psychological examination of the Plaintiff on March 28, 2001. During the evaluation, Plaintiff revealed that she received counseling from a social worker in 1997 to handle emotional problems related to her SLE. The 1997 treatment did not last long and Plaintiff had not received any other psychological treatment since 1997. (Admin. R. 157). Plaintiff denied having suicidal or homicidal ideation, and no delusion was elicited. (Admin. R. 158). Plaintiff's memory, insight, and judgment were all "fair," and she had "average intellectual functioning." *Id.* Dr. Ravid concluded that Plaintiff has a satisfactory ability to understand, carry out, and remember instructions. She also concluded that Plaintiff "has impairments in her ability to respond appropriately to supervision and coworkers and work

pressures."  *Id.*  Dr. Ravid diagnosed Plaintiff with having "adjustment disorder[10] with mixed anxiety and depressed mood," and she ruled out dysthymic disorder and mood disorder due to SLE.  (Admin. R. 159).  Dr. Ravid did not state that Plaintiff's mental impairments constituted a disability.

On April 11, 2001, Dr. Joseph Minola reviewed the Plaintiff's medical record, and completed a Psychiatric Review Technique form.  (Admin. R. 165-78).  Dr. Minola found that Plaintiff had only moderate difficulty in maintaining concentration, persistence, or pace, and found that Plaintiff had only mild restriction of activities of daily living and a mild difficulty in maintaining social functioning.  (Admin. R. 175).  Dr. Minola thereby concluded that Plaintiff's adjustment disorder failed to meet both sets of required diagnostic criteria and that she was not mentally disabled under C.F.R. Part 404.  (Admin. R. 155). *See* 20 C.F.R. § 404 Subpt. P, App 1 (2005).

Dr. Minola also provided a Mental Residual Functional Capacity Assessment on April 12, 2001.  (Admin. R. 153-56).  He opined that Plaintiff was moderately limited in areas of understanding and memory, as well as sustained concentration and persistence.  (Admin. R. 153).  However, Dr. Minola concluded that Plaintiff was not significantly limited in all areas of social interaction and adaptation.  (Admin. R. 154).  He also noted that Plaintiff possessed no "marked" limitations in performing activities of daily living.  (Admin. R. 155).

---

[10]         In Section 12.04, the C.F.R. describes adjustment disorder as being characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  In order for adjustment disorder to qualify as disabling:

(1) the patient must experience a "marked" degree of functional limitation in either "restriction of activities of daily living," "difficulties in maintaining social functioning," or "difficulties in maintaining concentration, persistence, or pace" and

(2) there must be a "medically documented history of a chronic affective disorder of at least two years' duration that has caused more than minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication.  20 C.F.R. § 404 Subpt. P, App 1 (2005).

On June 3, 2003, more than two years after Dr. Minola completed his assessment, a physician found Plaintiff to have a depressed affect, as she was tearful in the office. (Admin. R. 302). However, the physician did not prescribe any new medication for Plaintiff and it does not appear from the record that he made any psychiatric referral. Plaintiff testified that a doctor suggested that she see a mental health professional, but it does not appear that it was the doctor who examined her on June 3. (Admin. R. 782). Plaintiff never made an appointment to see a professional to address her mental health issues. *Id.*

*Expert Medical Testimony Considered by the ALJ*

Dr. Harold Bernanke served as an expert medical witness and testified on December 3, 2003. (Admin. R. 771-87). After reviewing Plaintiff's medical records, he offered an overview of her condition. He testified that, at the time, Plaintiff suffered from arthralgia, a malar rash across her nose and cheeks, and generalized aches as a result of SLE. *Id.* Her SLE was complicated by renal involvement but laboratory tests showed that her renal involvement did not qualify as a severe impairment. (Admin. R. 772). Dr. Bernanke testified that Plaintiff experienced "major involvement[]" of the joints. (Admin. R. 773). She experienced skin and hematopoietic involvement "to some extent." *Id.* She also "always r[a]n a kind of low grade anemia," but her hematocrit level was never low enough to meet the "terms of the Social Security standards for disability." *Id.* Dr. Bernanke also testified that Plaintiff suffered from Raynaud's Phenomenon,[11] an ailment that caused Plaintiff discomfort when she was exposed to the cold. (Admin. R. 774). Bernanke further noted that Plaintiff had long suffered from

---

[11]It appears as if Plaintiff was diagnosed as experiencing Raynaud's Phenomenon at least as early as July 19, 2000, by an unidentified physician. (Admin. R. 250). However, the handwriting is difficult to decipher and Plaintiff never alleges a disability due to Raynaud's Phenomenon.

headaches which may be symptomatic of SLE, but "there[] [had] been no significant, negative outcome." *Id.* According to Dr. Bernanke, echocardiograms revealed that Plaintiff did not suffer from the pericardial effusion, *i.e.,* fluid around the heart. According to Dr. Bernake, fluid around the heart is indicative of SLE. (Admin. R. 773).

Dr. Bernanke testified that Dr. Lazarus had documented that Plaintiff experienced unpredictable flares at times, but that "more recent records from Bellev[ue] . . . [indicated] there were times, many times on examination when she either had minimal findings or basically she was 'well.' That doesn't mean that she was truly without symptoms but . . . she was functional." (Admin. R. 773). In considering the effect of the flares, Dr. Bernanke testified that the "documented flares . . . make it hard to predict, you know, in terms of the real world, what her employment could be." (Admin. R. 774).

Nevertheless, even after considering Plaintiff's flares, Dr. Bernanke testified that "[Plaintiff] does not meet the [Social Security] listings . . . for lupus because of the fact that although she has documented generalized symptoms, the degree of organ involvement of any particular system . . . [is] not documented to be as disabling as Social Security would require. . . . [A]t her best time, she could do possibly sedentary or even light [work]." *Id.* Dr. Bernanke further considered Plaintiff's vocational prospects and stated, "[I]t's otherwise really not possible to predict, you know, exactly what her day-to-day performance might be, although it's possible, she could do some kind of, as I said, sedentary work . . with, you know, some understanding on the part of an employer such as like she had from her teachers in school." *Id.*

Plaintiff was taking Prednisone at the time. Dr. Bernanke agreed with Plaintiff that the drug carries with it many side effects, and he did not dispute the possibility that taking it could lead to depression. (Admin. R. 781). However, he cautioned against equating clinical notes that

said Plaintiff expressed a depressed affect with a clinical diagnosis of depression. Again, Dr. Bernanke pointed out that there was nothing in the record to support that diagnosis or any other possible side effect of the drug and "the records don't establish a psychiatric diagnosis." (Admin. R. 784). Dr. Bernanke also specifically testified that any diagnoses made of "pleuric and upper chest pain" was similarly unsupported by X-Rays and undocumented. (Admin. R. 780).

With respect to the Social Security requirements for disability, Dr. Bernanke testified that none of Plaintiff's organs exhibited the moderately severe involvement required for a determination of disability. "Her kidneys are working okay, fortunately." (Admin. R. 786). "[T]he same, more or less, holds for her hematopoietic system. . . . She didn't have cardiac involvement. She didn't have muscular involvement that we know of, ocular involvement, respiratory. There's nothing in the record that goes along with any of those." *Id.* Lastly, Dr. Bernanke adds that Plaintiff's arthralgia is not a determining factor either because it would require "a quite severe nature documented by X-Ray and so on." *Id.*

*Vocational Expert Testimony*

The ALJ also heard testimony from a vocational expert, Miriam Greene, to determine whether, considering Plaintiff's limitations, jobs exist in significant numbers in the national economy that Plaintiff could perform. The ALJ posed the following set of factors as a hypothetical to Greene: (1) a nineteen to twenty-two-year-old individual; (2) with a twelfth grade education; (3) who speaks English; (4) would be limited to a sedentary level of work; (5) and who would be limited to an environment that does not have temperature extremes--especially cold temperatures. In response, Greene testified that the hypothetical individual could perform the tasks required of (a) an appointment clerk, of which there are approximately 200,000 in the national economy and 15,000 locally, (b) some sedentary-level cashier positions, of which there

are 350,000 on the national level and about 5,000 locally, and (c) a file clerk, of which there are 75,000 positions in the national economy and 3,000 locally. (Admin. R. 788-790).

In response, Plaintiff asked Greene if her answers would change if the hypothetical individual (1) tires on a daily basis; (2) has pain in her hands due to swelling; (3) regularly had to miss six-hour school days due to an episodic condition; and (4) regularly had to miss work due to an episodic condition. (Admin. R. 792). Greene testified that such a person could not perform the tasks required of either an appointment clerk, sedentary-level cashier, or a file clerk. *Id.*

### The ALJ'S Decision

In a written decision dated April 8, 2004, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act and, therefore, was not entitled to either disability insurance benefits or supplemental security income payments. The ALJ utilized the five-step sequential analysis set forth in 20 C.F.R. § 404.1520 to reach his conclusion.

At step one of the analysis, the ALJ found that Plaintiff does not have any past relevant work experience other than part-time work as a salesperson and cashier from November 1999 through January 2000 and she had not engaged in any substantially gainful activity during the relevant period. At step two, the ALJ found that Martinez suffers from SLE and determined that SLE is a severe impairment.

Although SLE is a severe impairment it is not an impairment listed in the CFR. Therefore, at step three, the ALJ determined that Plaintiff's SLE is not equivalent in severity to any listed impairment--either singly or in combination. (Admin. R. 24). In reaching this determination, the ALJ considered the expert testimony of Dr. Bernanke, as well as the opinions of state agency medical consultants who shared Bernanke's conclusion.

At step four, the ALJ analyzed Plaintiff's "residual functional capacity." The ALJ concluded that Plaintiff has retained the residual functional capacity to perform the physical requirements of sedentary work, despite her mild and moderate non-exertional limitations. (Admin. R. 24-27). Specifically, the ALJ found that Plaintiff can lift and/or carry up to ten pounds, [and] she does not have any limitations on her ability to sit, and she can stand and/or walk for a total of two hours during the course of an eight-hour workday. (Admin. R. 27). The ALJ also found that "[Plaintiff] does not have any non-exertional mental limitations as evidenced by the fact that she does not receive any psychiatric treatment. The claimant . . . however, has some environmental limitations and cannot be exposed to temperature extremes." *Id.* The ALJ also noted that since Plaintiff has no relevant past work experience, an inquiry into whether she can resume prior employment is unnecessary. *Id.*

In the last step of this process, the burden shifted to the Social Security Administration to show there are jobs in the national economy in which the claimant can make a successful vocational adjustment considering her age, education, work experience, and residual functional capacity. The vocational expert, Miriam Greene, used Medical-Vocational Rule 202.21 as a framework for her analysis. She testified that there are substantial opportunities for a woman who graduated from high school to work in sedentary environments without temperature extremes. Greene concluded that Plaintiff could perform jobs such as a cashier, appointment clerk, and file clerk. The ALJ elected not to ask the vocational expert to consider the vocational prospects for a woman who was medically unable to miss less than one day of work a week; nor did the ALJ detail for the vocational expert the pains and discomforts associated with SLE. The ALJ did not take into account the testimony elicited by Plaintiff that an individual with her limitations who, *inter alia,* also has swelling and fatigue would not be able to find a suitable

vocation.  (Admin. R. 791-92).

## II.  Discussion

### A.  Standard of Court Review

In reviewing the decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998).  The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health and Hum. Serv.,* 685 F.2d 751, 755 (2d Cir. 1982) (citation and internal quotation marks omitted).  The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing."  42 U.S.C. § 405(g).  A remand by the court for further proceedings is appropriate where "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (collecting Second Circuit cases).  A remand to the Commissioner is also appropriate "where there are gaps in the administrative record."  *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (*quoting Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)).

**B. Standards Governing ALJs Evaluation of Disability Claims**

The Social Security Act is a remedial statute which must be "liberally applied;" its intent is inclusion rather than exclusion. *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975). An individual is "disabled" under the Social Security Act where there is "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof to demonstrate a disability by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5). *See also Carroll v. Sec'y of Health and Human Serv.*, 705 F.2d 638, 642 (2d Cir. 1983).

Pursuant to 20 C.F.R. § 404.1520, the ALJ determines disability under the Social Security Act by applying a five-step analysis. If at any step, the ALJ makes a finding that the claimant is not disabled, the inquiry ends there. At the first step, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the claimant has a severe impairment, without reference to age, education, or work experience. To be considered disabled, the claimant must have an impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities and that satisfies the durational requirement in § 404.1509. 20 C.F.R. § 404.1520(c). Third, the claimant is disabled if his or her impairment meets or equals an impairment listed in Appendix 1. 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment or an impairment that equals a listed

impairment, the ALJ makes a finding about the claimant's "residual functional capacity" in steps four and five. 20 C.F.R. § 404.1520(e). The "residual functional capacity" is "the most [the claimant] can still do despite . . . limitations." 20 C.F.R. § 404.1545(a). The ALJ considers all of the claimant's impairments and symptoms, including pain, that may cause physical or mental limitations. *Id.* In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(e). Finally, in the fifth step, if the claimaint cannot perform past relevant work, the ALJ determines whether the claimant could adjust to other work which exists in the national economy, considering factors such as age, education, and work experience. If there are such jobs available, despite claimant's functional limitations, the claimant is not disabled. 20 C.F.R. § 404.1520(f). At this fifth step, the burden shifts to the Commissioner to show that the claimant could perform the other work despite her functional limitations. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

### C. The ALJ's Determination that Plaintiff's Impairments Are Not the Equivalent of a Listed Impairment Is Supported by Substantial Evidence

The ALJ found that Plaintiff failed to satisfy step three of the five-step sequential analysis set forth in 20 C.F.R. § 404.1520(d). Plaintiff testified that her impairments caused fatigue and bone aches. (Admin. R. 764). Plaintiff also testified that she had chest pains, swelling, and generalized aches. The ALJ found that "claimant's subjective allegations regarding her impairment . . . are not credible in light of the medical evidence of record." (Admin. R. 26). The court agrees.

An ALJ is empowered to evaluate the credibility of a claimant's allegations of pain, and a determination that the allegations are not credible must be supported by substantial evidence.

*See Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979).  For an ALJ's determination to be supported by substantial evidence, the ALJ must consider the "entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record."  *See* SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996); *Rivera v. Schweiker,* 717 F.2d 719, 724 (2d Cir. 1983).  However, a claimant's testimony regarding pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other objective medical evidence.  *See Marcus,* 615 F.2d at 27.

The ALJ's determination that the Plaintiff's subjective claims of debilitating pain are not credible is supported by substantial evidence.  Both Plaintiff's testimony and the medical evidence demonstrate that Plaintiff suffers from continuous aches and pains associated with SLE, as well as unpredictable flares.  However, in light of the medical evidence, it is clear that Plaintiff overstated the extent of her SLE symptoms.

Plaintiff testified that she was "limping everywhere."  (Admin. R. 763).  She also testified, "My hands, I can't crunch them into a fist."  (Admin. R. 130).  However, Dr. Polak's examination on October 24, 2000, revealed not only that Plaintiff "ambulated without difficulty" and that her gait was normal, but also that Plaintiff was perfectly able to make a fist.  *Id.*  Dr. Babu Joseph echoed some of these findings and declared that Plaintiff's gait was normal.  (Admin. R. 161).  Plaintiff herself testified that she "walks fine."  (Admin. R. 764).

Dr. Bernanke, in his capacity as a medical expert, reviewed the medical record and considered Plaintiff's complaints of swelling, aching bones, and chest pain.  When he testified before the ALJ, he acknowledged the chronic pains associated with SLE and noted that Plaintiff

suffers from arthralgia and synovitis with a risk of flares. He concluded that, while Plaintiff suffered from major renal and joint involvement, as well as milder skin and hematopoietic involvement, her pains were not disabling.[12] Dr. Bernanke testified that Plaintiff's complaints of "pleuric and upper chest pain" were not supported by clinical evidence. (Admin. R. 780).

With regard to Plaintiff's claimed mental and psychological impairments, the medical evidence on record conclusively establishes that Plaintiff suffers from various symptoms of SLE, including fatigue and adjustment disorder. However, the ALJ correctly determined that the medical evidence does not support Plaintiff's assertion that they were disabling. In summarizing Plaintiff's psychiatric examination, Dr. Renee Ravid noted that despite relating fatigue and energy loss, Plaintiff was "alert and oriented to person, place, and time. Her memory is fair . . . Patient is able to perform most simple computations fairly well." (Admin. R. 158). However, "the patient has impairments in her ability to respond appropriately to supervision and coworkers and work pressures." *Id.* Dr. Ravid concluded that Plaintiff's "prognosis from a psychiatric point of view [was] fair with treatment." (Admin. R. 159). Dr. Joseph Minola completed both a psychiatric review and a functional capacity assessment based on Dr. Ravid's assessment. Dr. Minola concluded that Plaintiff was only moderately limited in her ability to complete a normal workday and workweek without interruption. (Admin. R. 154). Dr. Minola also concluded that Plaintiff's adjustment disorder created no more than a moderate difficulty in maintaining concentration and therefore did not meet the diagnostic criteria for disability. (Admin. R. 175).

As a matter of law, Plaintiff's moderate mental impairments do not amount to a disability.

---

[12]In making his determination, Dr. Bernanke considered many medical records written by unidentifiable physicians. However, while an ALJ cannot rely on the undocumented opinions of unidentified physicians as substantial evidence, Plaintiff's medical evidence is well-documented. *E.g., Montiero v. Heckler*, 641 F. Supp. 363, 367 (S.D.N.Y. 1986).

In *Estevez v. Apfel*, the court found that a plaintiff who had difficulties in maintaining social functioning, limitations on her ability to respond appropriately to supervision and coworkers, moderate deficiencies of concentration, and moderate limitations of her ability to meet normal attendance standards did not have the equivalent of a listed impairment. 97 CV 4034, 1998 WL 872410, (S.D.N.Y. Dec. 14, 1998). As further evidence that Plaintiff's impairments were not equivalent to a listed impairment, Plaintiff cared for her sister's four-year-old godson, a job that no doubt requires constant attention and physical agility. (Admin. R. 762-63).

Plaintiff testified that her medication was ineffective in treating her SLE. When questioned about the flares she experiences that signal the onset of pain, she said, "I raise [my Prednisone] dosage [during flares] and it's still the same way and this medicine actually isn't doing anything." (Admin. R. 767-78). However, Dr. Tang noted that Plaintiff "responded well to Prednisone during flares." (Admin. R. 137).

The ALJ also considered the medical opinion of Dr. Jill Landis. Dr. Landis' report states that Plaintiff's SLE involved her kidneys, joints, lungs, and skin. She added, "[Plaintiff] is currently unable to walk [more than] five blocks, stand [more than] one hour, a[nd] carry [more than] ten pounds." (Admin. R. 695). However, the ALJ gave Dr. Landis' assessment little weight because it was "cursory," unsupported by objective evidence, and because it ran contrary to the opinion of Dr. Lazarus, Plaintiff's primary care physician, who treated Plaintiff for much longer than Landis. (Admin. R. 26). A treating physician's opinion is given controlling weight when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Donnelly v. Barnhart*, No. 03-6264, WL 1496869 (2d Cir. July 1, 2004).

Moreover, the record indicates that Dr. Landis had contradictory opinions. On February 11, 2003, Dr. Landis concluded that Plaintiff could carry up to *one hundred pounds* "occasionally" throughout the workday. (Admin. R. 297). Less than three months later, on May 3, 2003, Dr. Landis found that Plaintiff was unable to carry more than ten pounds. (Admin. R. 695). The other medical evidence does not provide any explanation for this sudden drop in Plaintiff's functional capacity and supports the ALJ's decision to afford Dr. Landis' medical opinion little weight.

### D. The ALJ's Determination that Plaintiff Had Residual Functional Capacity Is Supported by Substantial Evidence

As part of the five-step sequential analysis, the ALJ must consider all of claimaint's impairments and symptoms in order to determine the extent to which the claimant can function in the workplace. Plaintiff asserts that the ALJ's conclusion that she has sufficient residual functional capacity is unsupported by substantial evidence because (1) she never told her doctor that she was able to attend college, and (2) her ability to attend college does not mean she had the residual functional capacity to perform substantially gainful employment.

The record indicates Plaintiff testified that, although she once considered applying to college and would still like to attend, she felt she was unable to stay focused on academics long enough to attend or even to complete her application. (Admin. R. 777). However, during an examination by an unidentifiable doctor in May 2001, Plaintiff stated that she was seeking SSI benefits so that she could attend college. (Admin. R. 291-93). Other than this statement, the court cannot find any evidence in the record that Plaintiff testified that she was able to attend college.

Even assuming *arguendo* that Plaintiff had said that she was able to attend college, the

ability to attend college does not mean that Plaintiff had the residual functional capacity to perform a gainful activity. *E.g., Parish v. Califano*, 642 F.2d 188, 191 (6th Cir. 1980) ("Attending college on a part-time basis is not the equivalent of being able to engage in a substantial activity."); *Cohen v. Sec'y of Dept. of Health & Hum. Serv.*, 964 F.2d 524 (6th Cir. 1992). In *Parish*, the court explained that the ability to attend class for seven or eight hours a week is far less demanding than full-time remunerative work. 642 F. 2d at 191-92.

Nevertheless, the ALJ's finding that the plaintiff had the residual functional capacity to attend college, even if it was in error, does not mean that his determination that plaintiff had the residual functional capacity to perform a job is unsupported by substantial evidence. The ALJ relied on Plaintiff's own testimony, her extensive medical records, her psychiatric consultative reports, the opinions of the state agency medical consultants, and medical expert testimony to make her determination regarding the Plaintiff's residual functional capacity. All of these sources established that Plaintiff could perform sedentary work. Therefore, the conclusion the ALJ drew was based on substantial evidence.[13]

### E.  The Hypothetical Question Posed of the Vocational Expert Need Not Contain An Exhaustive List of Symptoms in Order to Be Complete and Accurate

---

[13] Plaintiff relies on *Bowen v. Nelson*, 882 F.2d 45, 48 (2d Cir. 1989) for the proposition that relying on Plaintiff's ability to attend college in determining her residual functional capacity was an error. However, *Bowen* is distinguishable on multiple grounds. First, the Second Circuit reversed the trial court's decision to uphold denial of benefits because it found that claimants are entitled to individualized evaluations by vocational experts when evidence exists that does not support the lower court's determination. *Id.* at 49. *See McAndrew v. Heckler*, 562 F. Supp. 1227, 1230-31 (S.D.N.Y. 1983). Here, Miriam Greene evaluated Plaintiff's vocational prospects on an individualized basis and considered her environmental and exertional limitations. *Nelson* is also distinguishable in that the court found that the ALJ had "failed to show that Nelson could do even sedentary work." *Id.* at 48. There was no such failure in the instant case. Plaintiff testified. "I sit fine." (Admin. R. 764). In 2000, Dr. Tang found Plaintiff could sit without limit. (Admin. R. 138). In 2001, Dr. Lazarus found that Plaintiff could sit without limit. (Admin. R. 151). In 2002, Dr. Lazarus changed his opinion but still indicated that Plaintiff could sit for two to three hours at a time for a total of eight hours in a day. (Admin. R. 279). And the medical expert at Plaintiff's trial, Dr. Bernanke, also agreed that Plaintiff could perform sedentary work. (Admin. R. 774).

For an ALJ to rely on the testimony of the vocational expert, the hypothetical question posed of the expert must accurately reflect a true characterization of Plaintiff's impairments. *Jehn v. Barnhart*, 408 F. Supp. 2d 127, 135 (E.D.N.Y. 2006) ("The ALJ must pose hypothetical questions to the vocational expert which reflect the full extent of the claimant's capabilities and impairments to provide a sound basis for the [expert]'s testimony.").

Plaintiff argues that the hypothetical question posed to the vocational expert was inadequate because it did not include all of the pains and discomforts from which the Plaintiff suffers, as noted in her medical history. Plaintiff argues that a more detailed hypothetical question would have included the fact that Plaintiff experiences swelling and joint pain in her fingers, hands, wrists, shoulders, and knees, as well as anemia and fatigue that caused her to miss significant amounts of school when she was eighteen.

Plaintiff's contention is without merit. The vocational expert was not required to consider medical evidence not supported by the record when rendering an opinion about Plaintiff's vocational options. This is because "[v]ocational experts are not acceptable medical sources that can identify and assess a claimant's alleged impairments." *Uhlig v. Apfel*, No. 97 CV 7629, 1999 WL 350862, at *11 (S.D.N.Y. June 2, 1999). *See* 20 C.F.R. § 404.1513. Plaintiff's subjective complaints of SLE symptoms and other generalized pains were incorporated into the ALJ's conclusion that the Plaintiff could lift/carry up to ten pounds, sit without limitation, and stand/walk for a total of two hours during the course of an eight-hour work day. *See* 20 C.F.R. § 416.967(a). The vocational expert was only required to take into account medical evidence used by the ALJ to determine the Plaintiff's residual functional capacity. *See Mikol v. Barnhart,* 05 CV 5355, 2007 WL 1964556, *15-16 (S.D.N.Y. May 25,

2007) (finding that the ALJ properly omitted plaintiff's subjective and unsupported complaints of pain from a hypothetical question posed to a vocational expert); *Miller v. Barnhart*, 02 CV. 27, 2003 WL 749374, *8 (S.D.N.Y. Mar. 4, 2003) (same); *Molina v. Apfel*, 43 F. Supp. 2d 192, 205 (D. Conn. 1999) (hypothetical posed to vocational expert not incomplete when it did not include subjective complaints of pain and medical aliments not supported by the record).

Plaintiff urges the court to follow *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981) in finding the ALJ's hypothetical question legally insufficient because it did not incorporate Plaintiff's alleged SLE symptoms. In that case, the court found that the hypothetical question asked of the vocational expert did not accurately reflect the full extent of the pain that both Plaintiff and his treating physician *agreed* he suffered from. *Id.* at 114. Contrary to the case at bar, in *Aubeuf*, unlike in this case, the medical evidence indicated that the plaintiff suffered from "marked" pains and limitations, and the claimant's assertion as to the extent of his pain was supported by his treating physicians. Here, the ALJ properly found that the medical evidence did not support Plaintiff's claims.

### III.  Conclusion

The court finds that Plaintiff had a full and adequate hearing under the Commissioner's regulations and the ALJ's legal conclusions were supported by substantial evidence.  For the reasons expressed above, the court grants the Defendant's motion for judgment on the pleadings and dismisses Plaintiff's cross-motion for judgment on the pleadings.


SO ORDERED.


DATED:        Brooklyn, New York
              September 26, 2007


_____/s/_____
            DORA L. IRIZARRY
        United States District Judge